ELLISON *v.* SMITH.

Opinion delivered April 21, 1913.

1. DEEDS—FRAUDULENT PROCUREMENT—EVIDENCE.—Under the evidence in the case, the findings of the chancellor that deeds executed by plaintiff to defendants in partition and settlement of the estate of their father, were procured by the fraud of defendants, and would not be declared binding by a court of equity, were not against the preponderance of the evidence. (Page 625.)

2. DESCENT AND DISTRIBUTION—FAMILY SETTLEMENTS.—Family settlements, when fairly made, will be set aside only for strong reasons, but when a settlement is conclusively shown to be unfair and unequal, it will not be upheld. (Page 625.)

3. APPEAL AND ERROR—DECREE—WAIVER AS TO FORM.—When appellants request the court to make its decree in a certain form, they will be held to have waived any objections as to the form of the decree. (Page 626.)

Appeal from Montgomery Chancery Court; *J. P. Henderson,* Chancellor; affirmed.

STATEMENT BY THE COURT.

This is a suit by appellees to cancel certain deeds which the appellees allege were executed by the appellee, Lou Smith, to the appellants herein through the wrongful, fraudulent connivance, collusion and misrepresentations of the appellants. The appellants denied the allegations of fraud, deceit and misrepresentations set up in the complaint, and averred that the deeds were executed in pursuance of a family settlement made between appellants and appellee, Lou Smith.

John W. Ellison was the father of the appellants and Lou Smith, the appellee. He was the owner of considerable real estate in his lifetime, and personal property. He died in May, 1908.

Appellee, Lou Smith, testified that after the death of her first husband, she, at the request of her father, returned to his home and assisted him and her mother in keeping house. Her mother was old and in bad health, and her father persuaded her to return to his home and promised her that if she would do so, he would see that she was well paid. She agreed to do so, and he moved her on the 13th day of December, 1903. She did the household work and also did work in the field. Her mother took to her bed the 1st of April, 1904, and was sick until the 9th day of July, 1904, when she died. Appellee waited on her mother while she was sick, doing all the work about the house. When her mother died, her father, two brothers, and herself and little girl were left at the old home place. They all lived there together, she doing the housework of the family. On the 12th of August, 1906, her brother, Elijah, got married, leaving the rest of them in the family. In February, 1909, her brother, John, got married, leaving her father, herself and little girl at home. She then remained with her father until the 22d day of May, 1908, when he died. She stayed with the family from the time she first went there

after the death of her first husband until after her father's death, a period of about five years.

She details certain articles of personal property owned by her father at the time of his death and their value. Her father died suddenly. He frequently told her before his death that he wanted the boys to have their farms if they could, and he wanted certain lands, consisting of eighty acres, divided between the four children. The home place consisted of 166 acres. The personal property he wanted her to have. He told her what he wanted each one of them to receive.

Several years prior to her father's death, her brother, Dan, cleared, fenced and cultivated each year the lands that he now has. Her father paid the taxes on it. John tended a part of what he now has, and her father paid the taxes on it. Her brothers, John and Dan, got all that they made on the land that they worked. Her brother, Lige, remained with her father and worked the bottom lands that he now owns. Her father never conveyed any of his lands to the children before his death. He intended, however, for her brothers to have certain tracts of land that he designated and allowed them to cultivate as their own, but made them no deeds. He promised to let his son, John, have a certain tract of land and took a note for $350. He never executed to John a deed to that, and didn't intend for him to keep it. It was to go back to his estate if the note was not paid off.

Her testimony, after much detail, tends to show that her father intended to make an equal division as far as possible of the lands to her brothers, except the home place, six acres, and the tract adjoining it of 160 acres, which he intended for her to have, and as this was not equal in value to the portions that he expected her brothers to receive, she was to have all of the personal property to make her part of the estate equal with theirs, and to compensate her for the work that she had done in waiting on him and her mother before they died. She explained to her brothers after her father died just

how he wanted them to do, and her brothers told her it was all right.

Her testimony shows that at the time of her father's death, she didn't know exactly how much money her father had. There was $220 in the house that was divided among the children. Her father often told her that he had as much as $1,000 buried. She received $220. She didn't know how much her brothers received; supposed they got one-fourth each.

Appellee sold, upon the advice of her attorney, a fourth interest in the lands that were her father's at the time of his death, as she was advised, for the purpose of enabling her to bring this suit. Some time after the death of her father, she and her brothers had a settlement in which she executed deeds to them, and they in turn executed deeds to her, in which their wives did not join, conveying to her forty acres of land as her share in the settlement. She didn't remember that the draftsman of the deeds read same over to her. She left the matter of the deeds to the lands all to her brothers. She denied that they stated that if she wanted any more lands that they would deed it to her. She had bought seventeen acres of land from her brother, John, after her father's death, and when the settlement was made, she got a deed to that piece of land and paid him for it when the money was divided.

After the settlement was made, Lige, her brother, came and offered her $50.00, and she refused to take it. She states that she didn't call on her brothers for a division of the money before the settlement was made, in which the reciprocal deeds were executed because she thought at the time she signed the deeds she was going to get the money, or she never would have signed them. She told the boys at the time the deeds were executed, that she was to have all of the personal property. She stated that her brother, John, stated to the other boys as follows: "Now, boys, I feel that Lou ain't got her part, and I think we ought to give her $20.00," and the other

boys objected, and he says, "I am going to give her $20.00." John gave her the $20.00.

It was shown that the forty acres of land deeded to her was worth about $200. When the draftsman wrote out the deeds she was around the house and in the kitchen and in the room where he was part of the time, but didn't pay any attention to what he was doing. He did most of the writing in one room when she was in the other part of the house.

On behalf of the appellants, there was testimony introduced tending to show that within two or three days after the division of the land, appellee stated to a witness that they had divided up everything satisfactorily. She stated that she got the home place, six acres, and one forty of timber land, and in the same conversation the witness asked her, "Is that all the land you got?" and she said, "Yes," that she didn't want it, that she would get her part in other stuff. She didn't state what the other stuff would be, and the witness didn't ask her.

It was shown that John W. Ellison, Sr., in his lifetime, had stated to a certain witness that he had given John and Dan their lands, and that he intended Lige, at his death, to have his. He didn't describe the land by numbers. He didn't tell witness what he had given to his daughter. Said that he intended for her to have a living as long as she lived and stayed with him. Another witness testified that John W. Ellison told him in 1908 that he had given all of his land to his boys. Stated that he had given the lower field to Elijah and the rest of the land to the other boys. He died about a month after this conversation.

The witness who wrote the deeds at the time the division was made testified that he was informed by A. D. Ellison that he and his brothers and sister Lou had agreed to divide their lands, and wanted witness to come up and write their deeds for them, and after some investigation as to the character of the deeds that should be written, he went there "and found Lou and the three boys there expecting him." He asked them if they were

ready for him to go to work, and they said they were, and he sat down at the table and wrote the deeds. They told him what they wanted on each one's deed. Lou's (Mrs. Smith's) was the last deed he wrote. After reading them over to them, they all signed their deeds. Three signed one and the other three the other all the way through. After he had written the deeds, and while he was writing the acknowledgments to the deeds, they were all in the other room. About the time he finished writing the deeds, they came back. John and Dan had decided to deed to Mrs. Smith more land. The land they were going to deed to her was timber land. John asked Lou which forty it was she wanted, and she told him she didn't know. They decided among themselves what forty it was. He wrote her a separate deed to that forty in addition to the separate deed to the home place, six acres. After witness put down that forty, John asked Lou if she wanted any more land, and Lou told him no, that was all she wanted; it would be plenty, and it was getting late, and after that they signed up. He read the deeds over to them, to see if he had the description correct, in the presence of all of them, and the numbers in each deed showing what each one got. The plaintiff and the defendants, on that occasion, were all seemingly in good humor. Witness heard of nothing only good feeling, and he heard of no dissatisfaction at all.

The first deed conveying land to Lou Smith described a six-acre and a seventeen-acre tract. The boys called off that seventeen acres in the deed. They told what to write in the deed, and he wrote it as they told him. Witness thought when he wrote the deed that the seventeen-acre tract he was putting in the deed belonged to the estate, but he had heard since then that it belonged to one of the boys; they didn't tell him at that time.

Appellant, John W. Ellison, testified substantially as follows: He and his father had an understanding as to how his father wanted the lands divided at his death. He designated the tracts that he wanted each one to have and wanted them to divide it up equally amongst them,

so as to make all their shares equal. When the deeds were written, they took the old deeds and put them before the draftsman and pointed out the land that each one was to get. They divided the personal property equally. After the funeral expenses were paid, there was $980.00 left; $245 apiece. His sister, Mrs. Smith, accepted her part without objection. Witness stated that his father told him that he wanted the money he had buried "divided amongst each one of them; he wanted it divided equally." There were some notes when witness's father died, and, "When we collected the money we just divided it equally amongst us four, as father had requested. After we divided up, I just said to the boys, 'She ain't got nobody to work for her, and a widow. I am willing to give her $20.00 here, and you boys can, if you want to, make her a present of it,' and they said they would help her later on if she needed it. I just handed her a $20.00 gold piece. One day we boys were talking about it, and they said they didn't know what they would do about it, but they said they would help her if she needed it, and they said she had never handled much money, and she might accidentally run through with it, and they said they would rather it was used to a good advantage."

Witness further testified that his sister "signed up everything of her own free will." It was eighteen months after the deeds were made before witness knew that she was dissatisfied with the settlement. She never offered any suggstion to witness as to the settlement; never expressed any dissatisfaction. The land that witness's father intended him to have, after he gave it to witness, he (witness) went to work on it. He cleared and fenced and tried to improve it all he could. Cleared about thirty acres and had fenced about fifty acres. It had been about thirteen years since witness commenced clearing on it. He commenced clearing on it after his father told him that he was giving witness the land. He entered upon the land and commenced improvements in pursuance with the gift his father had made. He used the proceeds of the crops in building on it and for improvements as far

as it would go. Witness had occupied the land ever since his father gave it to him as his own. Witness entered other lands as an additional farm homestead. Witness's father had deeded to him sixty acres of land in order that he might make an additional farm homestead. He was to pay his father $250 for that land. He executed his note for that sum. The note to his father was after he made the homestead entry. At the time he made the note to his father, his father said, "Understand, I don't aim for you to pay for this land. I ain't made Dan no deed to his land, and if I was to make you out a deed to it, he might not like it." He says, "That will be all right about it, and you need not be uneasy about it." The sixty acres called for in the note was actually conveyed to witness by the other heirs, and he holds the title by their conveyances.

In reference to the division, witness testified that after his father's death, they met at the old home place for a division of the property. Witness described what took place as follows: "The best way I see to come at that is, we met down there to find out what each one was going to get and so after we get agreed on it and she wanted everything in the house, and we wanted some things for a keepsake, you know, and we couldn't agree on it that way, so then, we met again after everything got settled, and she agreed that just what was in the house she would take and let us have what was outdoors. So we went ahead and fixed it up that way, and she was to get the house place and what was in the house, and when the deeds was wrote, we gave her a forty-acre tract of land, and then offered her more, and said, is that all she wanted, and, of course, we were at the end of our row then."

The testimony of the other appellants substantially corroborated that of John W. Ellison as to the division of the property, showing that it was the intention of their father that each should have certain tracts of land, which he designated before his death for them to take.

The chancellor made, among others, the following

findings of fact: That the lands claimed by the appellants as their share of their deceased father's estate was of the value of $4,000; that the father's intentions were to give the appellants the land as claimed by them respectively, but that the gifts were never perfected. "There was no gift *in presenti* of the lands to defendants. There was no advancement of these lands. In the division of the estate of the deceased father, these lands were not considered and were taken by defendants respectively as absolute gifts from the father and not as advancements, and were in no way accounted for in said division, and that the remainder of the estate was divided approximately equally among themselves and the plaintiff in this case, and that such division resulted in an unequal and unjust distribution of said estate.

That the plaintiff, having admitted that the father's intentions were for the defendants to have these lands respectively, upon her receiving the household goods, the money and other personal property, the house place of six acres, the home place of 160 acres and the value of one-fourth of thirty-one acres sold to Elijah for $200, that the defendants would be entitled to have their title to said lands, respectively, quieted and confirmed in them, but having failed to so elect, the values thereof must be put in hotch-pot and the estate divided equally between the four children, share and share alike. That plaintiff informed defendants from time to time, and at the time the deeds of partition were executed, that she desired to carry out strictly the expressed intentions of the father as to the division of the estate; "that the defendants knew of her understanding and claim as to what she expected to receive as her share of the estate; that they did not inform her that the estate would be so divided; that in their deeds they gave themselves all the lands their father intended them to have, and gave the plaintiff a deed to the house place, containing six acres, of the value of approximately $150.00, and divided the balance equally between the four. At the time when these deeds were being prepared, and when they were executed, plain-

tiff believed she was to have her share out of the estate, and this fact was known to the defendants at the time. That she informed them she didn't care for lands; that they could divide it to suit themselves and give her just what they pleased. * * * There was no dispute between the parties at the time of the partition of the land. There was nothing calling for an amicable or family settlement; nothing to compromise. The division was to be made in accordance with the expressed wish of the father, and there was no dispute between them as to what these wishes were; that these deeds were executed to the defendants upon the express understanding of the wishes of the father that she was to have her share out of the money; that the defendants knew her contention and permitted her to execute the deeds under this impression; that there was fraud and imposition practiced upon the plaintiff in permitting plaintiff to execute such deeds to them and their accepting the same when they knew that plaintiff was laboring under the impression that she was to have her part of the estate out of the money. That it was five months and one day after the execution of the deeds until she found out she was not to get her full share of the estate; that she is not estopped by said deeds from bringing this suit. * * * That there was no amicable or family settlement of the estate that was binding in equity or good conscience upon the plaintiff, their minds having never agreed. That plaintiff, believing she was to get her share in money, and the defendants knowing this belief on her part, accepted the deeds in consideration thereof, and that they are bound to carry out their implied contract, or else their deeds should be declared void as to plaintiff. That all gifts of the personal property by the father to plaintiff, and defendants were not intended as advancements, or that the same should be accounted for, and that all such claims should be dismissed for want of equity; that the intentions of the father that plaintiff should have her share of his estate out of certain property can not now be enforced because the property was never delivered to her in his life-

time. That the deed from plaintiff to her husband was without consideration and is void. That the claim of plaintiff for her services rendered her father has not been sustained, and should be dismissed for want of equity.

The defendants, while objecting and excepting to the findings of the court, requested the court, upon these findings, to find the value of all the property, both real and personal, of the estate of said John W. Ellison at the time of his death; that the partition of the lands and deeds thereto, as made by them respectively to each other, be permitted to remain good and valid conveyances and to confirm in them respectively their titles, and to declare the amounts remaining due by each, and the amounts due respectively by defendants to plaintiff. The court rendered judgment in accordance with this request, in favor of the appellee, Mrs. Lou Smith, and declared the same a lien upon the respective interests of the appellants in the real estate coming to them respectively under the division made, and ordered the same sold to satisfy these judgments unless same were paid on or before a certain date. From the findings and decree, this appeal has been duly prosecuted.

*Pole McPhetridge*, for appellants.

1. Courts approve of family settlements, where fairly made without fraud or undue influence. 15 Ark. 51, 275; 41 *Id.* 270; 64 *Id.* 19; 84 *Id.* 610; 98 *Id.* 93; 14 Cyc. 131.

2. Fraud must be proven. None was shown. 11 Ark. 378; 12 *Id.* 296; 43 *Id.* 454; 30 *Id.* 686; 19 *Id.* 522.

*Gibson Witt*, for appellee.

The chancellor's findings are conclusive unless against the clear preponderance of the testimony. 67 Ark. 134, 287; 68 *Id.* 314; 71 *Id.* 216; 92 *Id.* 359; 93 *Id.* 277. The findings are fully sustained by the evidence. 19 Cyc. 455.

WOOD, J. (after stating the facts). Without discussing the testimony in detail, which is set forth in the state-

ment, it is sufficient to say that we are of the opinion that the findings of the chancellor are not clearly against the preponderance of the evidence. The testimony of the appellee, Mrs. Smith, to the effect that it was the intention of her father that his children should share equally in his estate at his death is corroborated by the testimony of appellant's witness, Bates, in which he stated that on the next day following the execution of the deeds, or a short time thereafter, she came to his store, and in answer to a question by him if that was all the lands she .got in the division, she replied that she didn't care for the lands as she was to get ''her part of the estate out of other stuff.''

The testimony is ample to show that there was no reason for any discrimination upon the part of the father of these litigants in favor of the appellants. On the contrary, the evidence shows that appellee, Mrs. Smith, was held in the highest affection by her father, and she, by her loyal services and loving devotion to her father and mother during their old age and severe illness for several years prior to their death, proved that she was worthy of her father's love and confidence. It is unreasonable to believe that her father, imbued with natural impulses, would, in a division of his estate, discriminate against a widowed daughter in favor of his sons. We are of the opinion that he did not do so, and that the finding of the chancellor that the execution of the deeds, under the circumstances in evidence, was such a, fraud as no court of equity could declare binding upon her, was correct.

While family settlements, when fairly made, require strong reasons to prevent their enforcement, a settlement such as is indicated by the evidence in this record, could not be approved because it shows conclusively that it is very unfair and unequal, and was obtained from the appellee, Mrs. Smith, through the imposition of those whom she had the right to expect would treat her with the utmost fairness and impartiality.

The issue as to what were the intentions of the ancestor of these children in the division of his property and as to whether these intentions were honestly carried out in the settlement which they had among themselves are only of fact and no good purpose could be promoted by discussing further the evidence. The court was correct in its conclusions that there was no completed gift of the lands in controversy, and in the absence of the settlement which these brothers and sister attempted to make the law would give to them an equal share in his estate. The preponderance of the evidence shows that it was the purpose of John W. Ellison to divide his estate among his children equally, but that he desired that each of them should have certain portions of the property, which he designated, and that his daughter, the appellee, Mrs. Smith, should be made equal in the distribution of his estate by receiving personal property, in addition to her realty, that would make the portion coming to her equal to that received by her brothers.

The appellants have waived any objection they could have made as to the form of the decree, and the remedy declared by specifically requesting the court to make it in that form.

The judgment is in all things affirmed.